UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

ROBERT BASHORE,                          :
                                         :CIVIL ACTION NO. 3:18-CV-425
            Plaintiff,                   :(JUDGE MARIANI)
                                         :
      v.                                 :
                                         :
POCONO MOUNTAIN REGIONAL                 :
POLICE COMMISSION, et al.,               :
                                         :
            Defendants.                  :

## MEMORANDUM OPINION
### I. INTRODUCTION

Here the Court considers Pocono Mountain Regional Police Commission's Motion

for Summary Judgment (Doc. 34) with which Defendant Pocono Mountain Regional Police

Commission seeks judgment in its favor on Plaintiff's age discrimination and wrongful

discharge claims contained in the Complaint (Doc. 1) filed on February 20, 2018.  (Doc. 34.)

These claims arise from Plaintiff's December 26, 2016, termination from his employment

with the Pocono Mountain Regional Police Commission ("PMRPC") and Pocono Mountain

Regional Police Department ("PMRPD") for the alleged reason that he failed to qualify for

weapons proficiency and allegations related to a work injury he had sustained on July 13,

2016, in a "prisoner take down."  (Doc. 1 ¶¶ 12-13, 25.)   For the reasons discussed below,

the Court will grant Defendant's motion in part and deny it in part.

## II.  STATEMENT OF UNDISPUTED MATERIAL FACTS[1]

Plaintiff was certified as a police officer under Act 120 in 1985 and received his Municipal Police Officers Education and Training Commission ("MPOETC") card.  (PCSMF Doc. 41 ¶ 1; DAPCSMF Doc. 49 ¶ 1.)  Plaintiff began his employment as a police officer with Tunkhannock Township in 1989, which then joined Pocono Mountain Regional Police Commission (MPRPC) in 1995.  (*Id.*)  To serve as a police officer in a Pennsylvania Municipal Police Department, an officer must be certified by MPOETC pursuant to the Pennsylvania Municipal Police Education and Training Act ("Act 120"), 53 Pa. C.S.A. § 2161 et seq.  (DSMF Doc. 36 ¶ 1; PADSMF Doc. 41 ¶ 1.)  From the time of his employment with Tunkhannock Township until July 13, 2016, when he sustained an on-the-job injury, Plaintiff

---

[1] In some instances, the parties partially admit and/or qualify their responses.  (*See* Docs. 36, 41, 49.)  In the Statement of Undisputed Facts, the Court includes only those facts which are agreed upon.  The parties provide citations to the record in support of their stated facts (*see id.*), but the Court does not include them in the recitation set out in the text.

Normally the Court considers only the moving party's statement of undisputed facts and the non-moving party's responses thereto. M.D. Pa. L.R. 56.1.  Separate statements of fact not directly responsive to the movant's statement of fact are not contemplated by L.R. 56.1 and need not be given any evidentiary value.  *Rau v. Allstate*, Civ. A. No. 3:16-CV-359, 2018 WL 6422121, at *2 (M.D. Pa. Dec. 6, 2018), *aff'd*, 793 F. App'x 84 (3d Cir. 2019).  However, a court may exercise its discretion when presented with a separate counterstatement of facts.  793 F. App'x at 87.  Here the Court will consider Plaintiff's Counter-Statement of Material Facts (Doc. 41), but only because Defendant has responded to them in corresponding numbered paragraphs (Doc. 49).  Thus, the recited facts are derived from Defendant Pocono Mountain Regional Police Commission's Statement of Undisputed Material Facts ("DSMF") (Doc. 36), Plaintiff's Answer to Defendant, Pocono Mountain Regional Police Commission's, Statement of Undisputed Material Facts ("PADSMF") (Doc. 41); Plaintiff's Counter-Statement of Material Facts ("PCSMF") (Doc. 41), and Answer of Pocono Mountain Regional Police Commission to Plaintiff's Counter-Statement of Material Facts ("DAPCSMF") (Doc. 49).

worked as a police officer with the Pocono Mountain Regional Police Department. (DSMF Doc. 36 ¶ 2; PADSMF Doc. 41 ¶ 2.)

On July 13, 2016, Plaintiff completed an application for Heart & Lung Benefits. (PCSMF Doc. 41 ¶ 10; DAPCSMF Doc. 49 ¶ 10.) On July 20, 2016, Chief Wagner sent a letter to the Plaintiff acknowledging receipt of the application for Heart & Lung Benefits. (*Id.*) Plaintiff injured his right hip, right knee and right hand in a prisoner take down incident and was unable to work until he was returned to work on November 1, 2016. (*Id.*) On August 5, 2016, PMRPC and its workers' compensation insurance carrier issued a Notice of Temporary Compensation Payable. (*Id.*) Plaintiff was paid workers' compensation benefits. (*Id.*)

On October 20, 2016, Plaintiff was provided clearance by Mountain View Orthopedics to return to work on November 1, 2016. (PCSMF Doc. 41 ¶ 11; DAPCSMF Doc. 49 ¶ 11.) Plaintiff was released to full duty by his orthopedic physician. (DSMF Doc. 36 ¶ 7; PADSMF Doc. 41 ¶ 7.)

Sergeant David Poluszny, the Department's Firearms Instructor, was present for Plaintiff's November 2016 weapons qualification efforts and provided him remedial training. (DSMF Doc. 36 ¶¶ 24, 44; PADSMF Doc. 41 ¶¶ 24, 44.) Sergeant Poluszny was aware that Plaintiff was qualifying in November 2016 because he had been returned to work on November 1, 2016. (DSMF Doc. 36 ¶ 47; PADSMF Doc. 41 ¶ 47.) Sergeant Poluszny testified that he knew Plaintiff was out of work leading up to November 2016 with an injury

to his hand, he knew this while he was doing remedial training with Plaintiff, and he knew of the injury to his right hand which was his shooting hand. (PCSMF Doc. 41 ¶ 69; DAPCSMF Doc. 49 ¶ 69.)

Plaintiff's first November 2016 weapons qualifications attempts were under the oversight of Officer Dunlap. (DSMF Doc. 36 ¶ 48; PADSMF Doc. 41 ¶ 48.) Remedial training occurred on November 2, 2016, and November 3, 2016. (DSMF Doc. 36 ¶¶ 50, 53; PADSMF Doc. 41 ¶¶ 50, 53.) Plaintiff was told by Sergeant Poluszny that he failed two weapons qualification attempts on November 2, 2016. (PCSMF Doc. 41 ¶ 13; DAPCSMF Doc. 49 ¶ 13.) He was not told his scores; he was just told he failed. (*Id.*) Plaintiff was told by Sergeant Posluszny that he failed on November 3, 2016. (PCSMF Doc. 41 ¶ 14; DAPCSMF Doc. 49 ¶ 14.) He was not told his scores. (*Id.*) Sergeant Poluszny notified Chief Wagner that Plaintiff failed the weapons qualifications. (DSMF Doc. 36 ¶ 46; PADSMF Doc. 41 ¶ 46.) Chief Wagner's Record of Employee Conference dated November 4, 2016, accusing Plaintiff of failing his weapons qualification tests on November 1st and 2nd of 2016, and placing him on light duty, does not state that Plaintiff failed the test for not attaining an 80% score (240) on his weapons qualification. (PCSMF Doc. 41 ¶ 38; DAPCSMF Doc. 49 ¶ 38.)

Plaintiff testified that Chief Wagner told him he would have to obtain outside training by the National Rifle Association at his own expense. (PCSMF Doc. 41 ¶ 15; DAPCSMF Doc. 49 ¶ 15.) The Collective Bargaining Agreement ("CBA") specifically requires the

Defendant to pay tuition, equipment to be purchased, and reimbursement for mileage for attendance at any subject or course related to their duties. (PCSMF Doc. 41 ¶ 21; DAPCSMF Doc. 49 ¶ 21.) The CBA requires the Defendant to provide all officers with equipment necessary to safely and effectively perform their duties. (PCSMF Doc. 41 ¶ 23; DAPCSMF ¶ 23.)

Plaintiff was put on desk duty from November 7, 2016, to November 11, 2016, and then returned to the range for a qualification attempt with Sergeant Posluszny. (PCSMF Doc. 41 ¶ 16; DAPCSMF Doc. 49 ¶ 16.) Plaintiff was told he had failed again and had scored 236. (*Id.*) Plaintiff said he only needed a 225 (75%), but Sergeant Posluszny told him he needed a 240 (80%). (*Id.*) Sergeant Posluszny then took down the target, walked over to the burn barrel, dropped the target into the barrel, and told the Plaintiff to go home. (*Id.*) Plaintiff testified that he has never seen any document at the PMRPD that indicates a minimum pass/fail test score is 225, the MPOETC standard. (PCSMF Doc. 41 ¶ 18; DAPCSMF Doc. 49 ¶ 18.)

Plaintiff was relieved from duty on November 16, 2016, by Chief Wagner on the alleged basis that he did not pass his weapons qualification pursuant to Policy 6-3 (Weapons Qualification), Subsection (III)(E)(5). (PCSMF Doc. 41 ¶ 19; DAPCSMF Doc. 49 ¶ 19.) An executive session of the Commission was held on the same day. (*Id.*) Chief Wagner's letter states that "the outcome of the meeting was that we are bound by policy as set." (*Id.*) The only policy set by the Commission was under 6-3 (P#10) and 5-1(P#5).

(PCSMF ¶ 19 n.5.)  The department's alleged unwritten policy of a 240 passing score, which differed from MPOETC standard of 225, was never a policy of the Commission.  (*Id.*) The Commission required Plaintiff to successfully qualify within thirty (30) days after having received remedial firearms training from an outside source.  (PCSMF Doc. 41 ¶ 19; DAPCSMF Doc. 49 ¶ 19.)  Chief Wagner's letter to Plaintiff dated November 16, 2016, relieving him of duty for allegedly failing his weapons qualification test does not state that Plaintiff failed the test for not attaining an 80% score on his weapons qualification.  (PCSMF Doc. 41 ¶ 37; DAPCSMF Doc. 49 ¶ 37.)   Chief Wagner testified that being relieved of duty means Plaintiff is on unpaid status and is not to report to work.  (PCSMF Doc. 41 ¶ 74; DAPCSMF Doc. 49 ¶ 74.)

Plaintiff returned to his doctor on November 17, 2016, and was taken out of work again.  (PCSMF Doc. 41 ¶ 28; DAPCSMF Doc. 49 ¶ 28.)   He provided the work restriction to Chief Wagner.  (*Id.*)  Chief Wagner admitted that he would have been aware that the Plaintiff was placed back on full restrictions the day after November 16, 2016, by his doctor for acquired trigger finger.  (PCSMF Doc. 41 ¶ 74; DAPCSMF Doc. 49 ¶ 74.)  He testified that he did not recall any discussions with Plaintiff as to how he would undergo remedial firearms training within 30 days based on his medical restrictions specifically for his right hand, and he stated there was no policy for such a scenario.  (*Id.*)

Plaintiff's counsel sent a letter to the PMRPD dated November 23, 2016, enclosing a copy of a Petition for Penalties filed with the Pennsylvania Department of Labor & Industry,

Bureau of Workers' Compensation filed on November 23, 2016, alleging that Defendant refused to pay benefits to the Claimant and instead informed him that his claim was denied. (PCSMF Doc. 41 ¶ 28; DAPCSMF Doc. 49 ¶ 28.)

A Loudermill Hearing was held on November 23, 2016. (DSMF Doc. 36 ¶ 17; PADSMF Doc. 41 ¶ 17.) Defendant's Loudermill Hearing Notice to Plaintiff notified him that the issues to be addressed were: (1) Policy 6-3 Weapons Qualification, and (2) Failure to qualify with your primary service handgun on 11/1/16, 11/2/16, 11/3/16 and 11/11/16. (PCSMF Doc. 41 ¶ 39; DAPCSMF Doc. 49 ¶ 39.) The Notice does not state that Plaintiff failed the test for not attaining an 80% score for weapons qualification. (*Id.*) Chief Wagner admitted that as of November 23, 2016, he knew that Plaintiff was restricted from all work duties by his doctor for his hand/finger injury. (PCSMF Doc. 41 ¶ 88; DAPCSMF Doc. 49 ¶ 88.) Detective Robert Miller of PMRPC stated that Plaintiff first claimed a relationship between his prior work injury and his failure to qualify at the November 23rd Loudermill Hearing. (DSMF Doc. 36 ¶ 17; PADSMF Doc. 41 ¶ 17.)

Plaintiff was terminated on December 26, 2016. (PCSMF Doc. 41 ¶ 3; DAPCSMF Doc. 49 ¶ 3.) He was fifty-eight (58) years old at the time and had twenty-three (23) years of continuous employment and service with the PMRPC. (PCSMF Doc. 41 ¶¶ 4, 5; DAPCSMF Doc. 49 ¶¶ 4, 5.) Sergeant Poluszny testified that it was the first time a police officer did not qualify and was terminated. (PCSMF Doc. 41 ¶ 72; DAPCSMF Doc. 49 ¶ 72.)

Chief Wagner sent a letter dated December 23, 2016, to the Plaintiff informing him to return his badge and department equipment. (PCSMF Doc. 41 ¶ 33; DAPCSMF Doc. 49 ¶ 33.) Though the letter was dated December 23, 2016, it was mailed on December 27, 2016, as reflected on the U.S. Postage label. (*Id.*) Plaintiff had been out of work due to his work injury from November 17, 2016, through his date of termination on December 26, 2016. (PCSMF Doc. 41 ¶ 34; DAPCSMF Doc. 49 ¶ 34.) Chief Wagner's letter dated December 23, 2016, terminating Plaintiff from employment does not state that Plaintiff failed the weapons qualification test for not attaining an 80% score on his weapons qualification. (PCSMF Doc. 41 ¶ 36; DAPCSMF Doc. 49 ¶ 36.)

At the time of his termination, Plaintiff was less than two years from his retirement eligibility for being over 50 years of age and having 25 years of service. (PCSMF ¶ 6; DAPCSMF ¶ 6.) As such, he would have been entitled to Pension Benefits due to his age being over 50 and having attained 25 years of service. (*Id.*) Plaintiff would also have been entitled to Post-Retirement Health Care at 50% premium. (*Id.*)

On January 4, 2017, an Order was issued by the Honorable Alan Harris, Workers' Compensation Judge, stating the following: "AND NOW, following a hearing which took place on December 28, 2016, and upon finding that Claimant's benefits were suspended in violation of law, it is ordered that Claimant's benefits be reinstated as of October 12, 2018." (PCSMF Doc. 41 ¶ 29; DAPCSMF ¶ 29.)

Defendant's Minutes of Meeting dated January 5, 2017, reflect that Chief Wagner made an offer of employment to Candidate Amanda Healy and Candidate Ryan King for 2018 hiring. (PCSMF Doc. 41 ¶ 91; DAPCSMF Doc. 49 ¶ 91.) Chief Wagner testified that Ryan King and Amanda Healy were both in their late 20's. (PCSMF Doc. 41 ¶ 92; DAPCSMF Doc. 49 ¶ 92.) Chief Wagner admitted that he replaced the Plaintiff with an individual who was under 40 years of age. (PCSMF Doc. 41 ¶ 93; DAPCSMF Doc. 49 ¶ 93.) Detective Robert Miller stated that there are officers in the department in the same age group as Plaintiff. (DSMF Doc. 36 ¶ 21; PADSMF Doc. 41 ¶ 21.)

On March 12, 2019, PMRPC passed a motion proposed under "New Business" to revise Policy 6-3 (Weapons Qualification) to set the rate for passing the service weapon qualification at 80%. (PCSMF Doc. 41 ¶ 95; DAPCSMF Doc. 49 ¶ 95.) This was done over two years following the termination of the Plaintiff for allegedly failing to qualify with his service weapon by application of an 80% pass rate. (*Id.*)

To qualify with a weapon at PMRPC, an officer must meet a "pass/failure" qualification test. (DSMF Doc. 36 ¶ 9; PADSMF Doc. 41 ¶ 9.) Sergeant Poluszny testified that qualification and training for PMRPD is done twice a year. (DSMF Doc. 36 ¶ 24; PADSMF Doc. 41 ¶ 24.) Sergeant Posluszny received his certification for his position as firearms instructor from the National Rifle Association. (DSMF Doc. 36 ¶ 25; PADSMF Doc. 41 ¶ 25.) No certification for his position as firearms instructor is secured from the Municipal Police Officers Education Training Commission ("MPOTEC"). (*Id.*) He agreed there was no

written policy or regulation memorializing the minimum weapons passing score of 80%. (DSMF Doc. 36 ¶ 28; PADSMF Doc. 41 ¶ 28.) PMRPD Policy 6-3, Weapons Qualification, at relevant times herein, indicates that "[a]ll officers shall be graded at a pass/fail basis for purposes of firearm qualifications." (DSMF Doc. 36 ¶ 41; PADSMF Doc. 41 ¶ 41.)

Chief Wagner acknowledged that Title 37, Section 203 establishes regulatory requirements to police firearm qualification courses with a minimum passing score of 75%. (PCSMF Doc. 41 ¶ 77; DAPCSMF Doc. 49 ¶ 77.) The standard did not change with MPOETC prior to Plaintiff's weapons qualification or any time after. (*Id.*) Chief Wagner testified that the department's firearms training curriculum has always been 80% for the history of the department. (PCSMF Doc. 41 ¶ 78; DAPCSMF Doc. 49 ¶ 78.) However, David Cook, who was a member of the PMRPD from 1974 through 2002, and was an active NRA certified firearms instructor for 15 of those years, provided an Affidavit attesting to the qualification being based on NRA and MPOETC standards which was a score of 225/300 or 75% for a uniformed officer. (*Id.*) This Affidavit contradicts Chief Wagner's sworn testimony since Chief Wagner has been employed by the PMRP Department since 1994 and served consecutively with Mr. Cook while he was the firearms instructor until his retirement in 2002. (*Id.*)

Chief Wagner admitted that he could not provide any document from the department's manual that set a passing score at 80%. (PCSMF Doc. 41 ¶ 79; DAPCSMF Doc. 49 ¶ 79.) He testified that the only place an 80% passing score is mentioned is in a

PowerPoint presentation that is maintained by the firearms instructor. (PCSMF Doc. 41 ¶ 80; DAPCSMF Doc. 49 ¶ 80.) Chief Wagner admitted that there is no policy or memorandum in the department which sets an 80% standard for passing the weapons qualification which a police officer can go and review. (PCSMF Doc. 41 ¶ 81; DAPCSMF Doc. 49 ¶ 81.)

Chief Wagner acknowledged that Plaintiff would have met the minimum passing score for MPOETC during his firearm qualification in November of 2016. (PCSMF Doc. 41 ¶ 82; DAPCSMF Doc. 49 ¶ 82.) He testified that Policy 6-3 (Weapons Qualification) contains a provision that all officers shall be graded on a pass/fail basis and that there is no mention of an 80% standard. (PCSMF Doc. 41 ¶ 83; DAPCSMF Doc. 49 ¶ 83.)

### III. STANDARD OF REVIEW

Summary judgment "is appropriate only where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." *Gonzalez v. AMR*, 549 F.3d 219, 223 (3d Cir. 2008). "An issue is genuine only if there is a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party, and a factual dispute is material only if it might affect the outcome of the suit under governing law." *Kaucher v. County of Bucks*, 455 F.3d 418, 423 (3d Cir. 2006) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). Thus, through summary adjudication, the court may dispose of those claims that do not present a "genuine dispute as to any material fact." Fed. R. Civ. P. 56(a).

The party moving for summary judgment bears the burden of showing the absence of a genuine issue as to any material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). Once such a showing has been made, the non-moving party must offer specific facts contradicting those averred by the movant to establish a genuine issue of material fact. *Lujan v. Nat'l Wildlife Fed'n,* 497 U.S. 871, 888, 110 S. Ct. 3177, 111 L. Ed. 2d 695 (1990). Therefore, the non-moving party may not oppose summary judgment simply on the basis of the pleadings, or on conclusory statements that a factual issue exists. *Anderson*, 477 U.S. at 248. "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by citing to particular parts of materials in the record . . . or showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A)-(B). In evaluating whether summary judgment should be granted, "[t]he court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3). "Inferences should be drawn in the light most favorable to the non-moving party, and where the non-moving party's evidence contradicts the movant's, then the non-movant's must be taken as true." *Big Apple BMW, Inc. v. BMW of N. Am., Inc.,* 974 F.2d 1358, 1363 (3d Cir. 1992), *cert. denied* 507 U.S. 912, 113 S. Ct. 1262, 122 L. Ed. 2d 659 (1993).

However, "facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." *Scott v. Harris*, 550 U.S. 372, 380, 127

S. Ct. 1769, 167 L. Ed. 2d 686 (2007).  If a party has carried its burden under the summary

judgment rule,

> its opponent must do more than simply show that there is some metaphysical
> doubt as to the material facts.  Where the record taken as a whole could not
> lead a rational trier of fact to find for the nonmoving party, there is no genuine
> issue for trial.  The mere existence of some alleged factual dispute between the
> parties will not defeat an otherwise properly supported motion for summary
> judgment; the requirement is that there be no *genuine* issue of *material* fact.
> When opposing parties tell two different stories, one of which is blatantly
> contradicted by the record, so that no reasonable jury could believe it, a court
> should not adopt that version of the facts for purposes of ruling on a motion for
> summary judgment.

*Id.* (internal quotations, citations, and alterations omitted).

"In considering a motion for summary judgment, a district court may not make

credibility determinations or engage in any weighing of evidence."  *Anderson*, 477

U.S. at 255.  Therefore, when evidentiary facts are in dispute, when the credibility of

witnesses may be in issue, or when conflicting evidence must be weighed, a full trial

is usually necessary.

## IV. ANALYSIS

a.  <u>Discrimination on the Basis of Age</u>

Plaintiff contends Defendant discriminated against him because of his age in

violation of the Age Discrimination in Employment Act ("ADEA") when it terminated him in

December 2016.  (Doc. 1 at 6.)  Defendant first argues Plaintiff's age discrimination claim

fails because he cannot establish a prima facie case of discrimination.  (Doc. 35 at 6-14.)

Plaintiff responds that Defendant's argument is without merit.  (Doc. 42 at 5-16.)  For the

reasons discussed below, the Court concludes summary judgement is not warranted on Plaintiff's age discrimination claim.

The ADEA prohibits employers from discriminating against individuals in hiring, discharge, compensation, terms, conditions, or privileges of employment on the basis of their age. *See* 29 U.S.C. § 623(a)(1). As summarized in *Palmer v. Britton Industries, Inc.*, 662 F. App'x 147 (3d Cir. 2016) (not precedential), "[t]he Federal Age Discrimination in Employment Act prohibits employers from taking adverse action against an employee who is at least 40 years old, 29 U.S.C. § 631(a), 'because of such individual's age.' 29 U.S.C. § 623(a)." 662 F. App'x at 150. The "[p]laintiff ha[s] the burden to show that his 'age was the 'but-for' cause of the employer's adverse action.'" *Id.* (quoting *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 177 (2009)).

Following *Gross*, the Court of Appeals for the Third Circuit confirmed that the burden shifting framework set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–03 (1973), is used when a plaintiff does not present direct evidence of discrimination. *Smith v. City of Allentown*, 589 F.3d 684, 691 (3d Cir. 2009). The parties agree the burden shifting framework applies here. (Doc. 35 at 4; Doc. 42 at 4.)

Under *McDonnell Douglas*, the plaintiff bears the initial burden of showing a prima facie case of discrimination. 411 U.S. at 802. Once the plaintiff establishes a prima facie case, the burden shifts to the defendant "to identify a legitimate non-discriminatory reason for the adverse employment action." *Smith*, 589 F.3d at 689. "This burden is 'relatively

light' and is satisfied if the employer provides evidence, which, if true, would permit a conclusion that it took the adverse employment action for a non-discriminatory reason." *Burton v. Teleflex Inc.*, 707 F.3d 417, 426 (3d Cir. 2013) (*citing Tomasso v. Boeing Co.*, 445 F.3d 702, 706 (3d Cir. 2006)). "At this stage, 'the defendant need not prove that the articulated reason actually motivated its conduct.'" *Id.* (*citing Shellenberger v. Summit Bancorp, Inc.*, 318 F.3d 183, 189 (3d Cir. 2003)).

Once the defendant offers a legitimate non-discriminatory reason, "the burden of production [shifts] back to the plaintiff to provide evidence from which a factfinder could reasonably infer that the employer's proffered justification is merely a pretext for discrimination." *Burton*, 707 F.3d at 426 (*citing Fuentes v. Perskie*, 32 F.3d 759, 764-65 (3d Cir. 1994)). To survive summary judgment, "the plaintiff must point to some evidence . . . from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Fuentes*, 32 F.3d at 764.

Here the parties dispute whether Plaintiff can establish a prima facie case of age discrimination. (Doc. 35 at 5; Doc. 42 at 5.) The Supreme Court has explained "that the prima facie case requires evidence adequate to create an inference that an employment decision was based on an illegal discriminatory criterion." *O'Connor v. Consolidated Coin Caterers Corp.*, 517 U.S. 308, 312 (1996). This showing "in effect creates a presumption

that the employer unlawfully discriminated against the employee," *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 254 (1981). The prima facie burden is not "onerous." *Id.* at 253. To warrant this rebuttable presumption "there must be at least a logical connection between each element of the prima facie case and the illegal discrimination" alleged. *O'Connor*, 517 U.S. at 311-12. To establish a prima facie case of age discrimination, the plaintiff must generally show the following: 1) he is forty years old; 2) the defendant took an adverse employment action against her; 3) the plaintiff was qualified for the position in question; and 4) the plaintiff was replaced by another employee who was sufficiently younger so as to support an inference of discriminatory animus. *Smith*, 589 F.3d at 689.

Defendant maintains that summary judgment is appropriate because Plaintiff's evidence is insufficient to support the assertion that he was qualified for the position or support an inference of discriminatory animus. (Doc. 35 at 6.) First, Defendant contends that Plaintiff is not qualified for his position as a law enforcement officer as he could not qualify with his weapon which is a condition of employment. (Doc. 35 at 8.) Defendant's argument is based on the assertions that Plaintiff incorrectly assumed that the pass/fail score for weapons qualifications at PMRPC was 225 (75%) which is the MPOETC passing score (Doc. 35 at 6); the PMRPC has mandated an 80% pass/fail score (240 out of 300) since 2003 (*id.* (citing DSMF Doc. 36 ¶ 11)); and Plaintiff was aware of the 80% pass/fail score since, at least, his attendance in 2002 and 2004 at PMPPD weapons qualification

training (*id.* (citing DSMF Doc. 36 ¶¶ 12-14, 29-30, 32-33, 39-40)). Defendant further asserts that it was allowed to set its minimum weapons qualifications score at a higher score than that of MPOETC. (*Id.* at 7 (citing DSMF Doc. 36 ¶ 3).)

The fundamental problem with Defendant's assertions of fact cited above is that each is denied by Plaintiff. (*See* PADSMF Doc. 41 ¶¶ 3, 11, 12-14, 29-30, 32-33, 39-40.) Plaintiff denies that the passing score has been 80% since 2003:

> It is specifically denied that the PMRP Department has had 240 out of 300 as the passing score for weapons qualification since 2002. To the contrary, the Affidavit of Chief Christopher Wagner is a sham. In ¶ 21 of his Affidavit he stated that "on or about May 10, 2019 he looked into the PMRPD archives boxes and located old firearm qualification records and his review led him to conclude that the weapons qualification passing score was set at 240 in the 2002-2003 time frame." (Defendant's Exhibit "H") This statement alone proves that the qualification score has never been 80%. Chief Wagner admitted that there was no official written policy located anywhere setting the pass rate at 80%; however, he allegedly found some documents in archives. Chief Wagner testified that there is nowhere in the police department where a police officer can go to and review documents that would set a pass rate at 80%, except for an alleged slide show presentation.

(PADSMF Doc. 41 ¶ 11.) In a footnote regarding documents found in archives, Plaintiff adds that "[t]he subject documents were provided after the close of discovery, and are suspect considering they were never produced in response to discovery requests; and all witnesses, including Chief Wagner, denied the existence of any documents or policies setting forth an 80% passing standard." (Doc. 41 at 8 ¶ 11 n.4.)

Plaintiff denies each paragraph upon which Defendant relies to support the statement that Plaintiff "was aware of the 80% pass/fail score since, at least, his attendance

in 2002 and 2004 at PMPRD weapons qualification training" (Doc. 35 at 6 (citing DSMF

Doc. 36 ¶¶ 12-14, 29-30, 32-33, 39-40)). (*See* PADSMF Doc. 41.) For example, in

response to Defendant's statement that "[t]he PMRPD PowerPoint for Basic Pistol Training

Course, which contains the weapons qualification score for SWAT (95%) and officers (80%)

is and has been available to all officers, including Plaintiff, on the PMRPD computer system

which documents the 240 passing score as well as range instruction" (DSMF Doc. 36 ¶ 29),

Plaintiff denies "that the alleged PowerPoint presentation is accurate or available to anyone

in the department." (PADSMF Doc. 41 ¶ 29.) Plaintiff further asserts that he

> and many other police officers, both active and retired, testified that they never
> knew, seen [sic] or heard of the existence of any PowerPoint presentation
> allegedly setting a passing score of 80%. Moreover, Sgt. Posluszny testified
> that no one else has an exact copy of the PowerPoint copy; only him. . . .
> Additionally, Sgt. Posluszny admitted that the PowerPoint presentation has
> never been to the Commission or any of its members for either review or to be
> voted on to make it official written policy of the department. And, he admitted
> that this is the only place where an 80% figure for pass/fail is located.

(PADSMF Doc. 41 ¶ 29.)

Plaintiff denies Sergeant Posluszny's assertion that he knew that the minimum score

was 240: though Sergeant Poluszny said they had "personally discussed it many times,"

Plaintiff says that Sergeant. Posluszny never informed him that a score of 240 was required

for passing the weapons qualification. (DSMF Doc. 36 ¶ 32; PADSMF Doc. 41 ¶ 32.) As for

Sergeant Posluszny's description of Plaintiff as a "subpar shooter" and the statement that

he worked with Plaintiff to increase his skill level and frequently discussed the score

required, Plaintiff denies the accuracy of the statements and notes the following:

if Sgt. Posluszny considered the Plaintiff's scores of 76% and 79%, respectively, as being a "subpar shooter" then he must consider every police officer in the Commonwealth of Pennsylvania who passes their weapons qualification for MPOETC certification with the same score to be a subpar shooter, including Pennsylvania State Police. The standard for Pennsylvania State Police is also 75%.

(DSMF Doc. 36 ¶ 33; PADSMF Doc. 41 ¶ 33.)

Plaintiff denies Defendant's assertion that "PMRPD PowerPoint for Basic Pistol Training Course Municipal Training documents state the 240 Minimum score required for PMRPD officers" and the PowerPoint "is, and has been long available to every PMRPD Officer on the PMRPD Patrol Share which is a folder in the PMRPD computer system that all officers can access." (DSMF Doc. 36 ¶ 39; PADSMF Doc. 41 ¶ 39.) In support of his denial, Plaintiff reiterates that he and many other officers who testified did not know or had not heard of a PowerPoint presentation which set a passing score of 80%, Sergeant Posluszny testified that he was the only one with an exact copy of the presentation, and the Commission had never reviewed or approved the presentation or voted to make 80% the official written policy of the PMRPD. (PADSMF Doc. 41 ¶ 39; *see also id.* ¶ 29.)

To Defendant's assertion that Sergeant Posluszny stated that MPOETC will allow a municipal police department in Pennsylvania to go higher than its passing score, Plaintiff responds that "there is not a shred of evidence presented in support of Officer David Posluszny's affidavit statement." (DSMF Doc. 36 ¶ 3; PADSMF Doc. 41 ¶ 3.) Plaintiff posits that "the passing score for a patrolman with the PMRP Commission is 75%, the same as mandated by the Pennsylvania Municipal Police Officers' Education and Training

Commission (MPOETC) (37 Pa. Code §203.11(11)(ii)(A)), and Defendant's official policy set

forth in Policy 6-3 Weapons Qualification (P#10) and Policy 5-1 (MPOETC) (P#5)."

(PADSMF Doc. 41 ¶ 3.) In his following answer, Plaintiff explains that Defendant's Policy 5-

1,

> (Municipal Police Officers Education & Training Act) (P#5) specifically directs
> that it is the "policy of the Pocono Mountain Regional Police Department to
> comply with the requirements of the Pennsylvania Municipal Police Officers'
> Education and Training Act as amended, (53 Pa.C.S.A. §2161, et seq.) in
> regards to municipal police officer training and agency responsibilities." (P#5,
> Policy 5-1, II, p. 5-1) The passing score mandated by the Pennsylvania
> Municipal Police Officers' Education and Training Commission (MPOETC) is
> 75%. (37 Pa. Code § 203.11(11)(ii)(A)).

(PADSMF Doc. 41 ¶ 4.)

The foregoing comparison of the parties' factual assertions, all accompanied by

citations to the record, unequivocally demonstrates that there are issues of material fact in

dispute regarding whether Plaintiff was qualified for his position as a patrolman at PMRPD.

While Defendant maintains the position that the heightened score needed to pass the

weapons qualification test was the widely-known, longstanding policy of the PMRPC which

Plaintiff needed to achieve to be qualified for his position, Plaintiff proffers sufficient

evidence to undermine Defendant's position.

Defendant points to the Supreme Court's decision in *Pembaur v. Cincinnati*, 475

U.S. 469, 480-81 (1986), in support of the proposition that an official policy need not be in

writing. (Doc. 35 at 13.) Plaintiff does not contend that a policy *must* be in writing but

essentially argues that *Pembaur* is inapposite to the situation here where Plaintiff frames the

issue as "whether Defendant's claimed standard for a passing score of 80% was an actual policy of the Commission." (Doc. 42 at 7.) The Court agrees that the issue here encompasses the question of whether an unwritten policy existed. Thus, *Pembaur's* instruction that a policy need not be in writing does not affect the disposition of Defendant's motion. The Court also agrees with Plaintiff's assessment that this is a disputed issue which must be decided by the finder of fact. (Doc. 42 at 6-7 (citing *Rodriguez v. Muhlenberg Hosp. Ctr.*, Civ. A. No. 97-CV-636, 1998 WL 398135 (E.D. Pa. June 25, 1998); *Doe v. Pennridge School District*, 413 F. Supp. 3d 393 (E.D. Pa. 2019)).)

If, as Plaintiff avers, the qualification requirement was an arbitrary, unwritten, and unapproved policy not widely known or publicized, at this stage of the proceedings it cannot be found as a matter of law to have superseded the MPOETC standard set out in 37 Pa. Code § 203.11(a)(11)(ii)(A) such that an individual would be deemed unqualified if he met the MPOETC standard but not the higher standard. Chief Wagner testified that Policy 5-1, which states that "[i]t is the policy of the Pocono Mountain Regional Police Department to comply with the requirements of the Pennsylvania Municipal Officers' Education and Training Act as amended, (53 Pa. C.S.A. Section 2161, et seq.) in regard to municipal police officer training and agency responsibilities," means that PMRPC follows the Title 37 guidelines. (Doc. 45-2 at 70, Wagner Dep., Pl.'s Ex. 33 at 70:4-18). 37 Pa. Code § 203.11(a)(11)(ii)(A) provides in pertinent part that "persons who are to be employed as police officers by police departments within this Commonwealth . . . shall . . . successfully

complete a basic police training course given at a Commission-certified school[,] . . . [and] [t]o qualify for this certification, an applicant shall . . . [a]chieve a minimum qualifying firearms score of 75%." Importantly, Defendant does not argue that Plaintiff did not satisfy the MPOETC standard.

Defendant's argument that summary judgment is warranted because Plaintiff cannot show he was qualified for the position fails because Defendant has not shown as a matter of law that Plaintiff was *not* qualified to be a police officer when he satisfied the MPOETC standard but scored less than 80%. Clearly the factual record presents disputed issues of material fact to be decided, credibility determinations to be made, and evidence to be weighed. Therefore, under well-established precedent, *see, e.g., Anderson*, 477 U.S. at 255, a jury must determine whether Plaintiff was qualified for his position.

Defendant also asserts that Plaintiff does not provide evidence that someone sufficiently younger replaced him in his position. (Doc. 35 at 13.) As to this fourth element of the prima facie case, *see Smith*, 589 F.3d at 689, Defendant does not expand upon its conclusory assertion which is clearly belied by the record and Chief Wagner's admission that he replaced Plaintiff with an individual who was under 40 years of age. (PCSMF Doc. 41 ¶ 93; DAPCSMF Doc. 49 ¶ 93.)

In sum, Defendant has not satisfied its burden of showing that Plaintiff cannot establish a prima facie case of age discrimination as a matter of law. Therefore, Defendant's motion for summary judgement will be denied as to Plaintiff's ADEA claim.

b. <u>Wrongful Discharge</u>

With Count II of his Complaint, Plaintiff claims that he was wrongfully discharged in that his termination was contrary to public policy, i.e., it was in retaliation for filing a workers' compensation claim, exercising his rights under the Workers' Compensation laws of the Commonwealth, and/or by forcing him to undergo weapons qualification while in a temporary disability status. (Doc. 1 ¶ 51.) With the pending motion, Defendant asserts that, as a union member, Plaintiff is unable to advance a claim that his termination falls within a public policy exception under Pennsylvania law. (Doc. 35 at 15-18.) Plaintiff responds that he establishes a claim under the public policy exception--though he does not address the impact of his union membership on such a claim, he states that he was denied the right to arbitrate his grievance, the subject of Count III of his Complaint.[2] (Doc. 42 at 16-18.) For the reasons discussed below, the Court concludes summary judgement is appropriate on Plaintiff's wrongful discharge claim.

The public policy exception to a cause of action for wrongful termination under Pennsylvania law was discussed at length in *Ciferni v. Day & Zimmerman, Inc.*, 529 F. App'x 199, 203–04 (3d Cir. 2013).

> In *Geary v. U.S. Steel Corp.*, 456 Pa. 171, 319 A.2d 174 (1974), Pennsylvania first recognized a narrow public policy exception to the at-will employment doctrine in holding that at-will employees may maintain tort suits for wrongful discharge when their terminations violate a "clear mandate of

---

[2] Count III of Plaintiff's Complaint is for Breach of Duty of Fair Representation against Pocono Mountain Regional Police Officer's Association. (Doc. 1 at 10.) Defendant Pocono Mountain Regional Police Officer's Association has not moved for summary judgment.

public policy." *Id.* at 184–85. This exception was applied in the context of terminating an at-will employee in retaliation for filing a workers' compensation claim in *Shick v. Shirey,* 552 Pa. 590, 716 A.2d 1231, 1232 (1998).

Pennsylvania courts consistently have held, however, that those common law wrongful discharge suits cannot be brought by union employees subject to a CBA. The first case to consider this issue was *Phillips v. Babcock & Wilcox,* 349 Pa.Super. 351, 503 A.2d 36 (1986), which held that the exception established by *Geary* did not apply to union employees. *Id.* at 38. In reaching its decision, the Court reasoned that such an extension would be inconsistent with the exception's purpose "to provide a remedy for employees with no other recourse against wrongful discharge." *Id.* at 37. The Court made clear that the public policy exception was not intended to vindicate public policy in all circumstances, but only where its violation would otherwise go without a remedy, explaining:

> The Supreme Court's decision in *Geary* was clearly concerned with the protection of corporate personnel in the areas of employment not covered by labor agreements.... The Court's purpose was to provide a remedy for employees with no other recourse against wrongful discharge.

> Appellant and all like-situated employees are not without recourse when faced with indiscriminate discharge even when the discharge violates public policy. The collective bargaining agreement in the instant case provides protection against suspension or discharge without "proper cause." Surely, in pursuing a grievance under the provisions of the agreement, if appellant can show that his discharge was in retaliation for his filing a workmen's compensation claim, he will have proved that his discharge was not for "proper cause." It would appear, therefore, that appellant will then be entitled to the remedies provided in the agreement.

*Id.* (internal quotation marks and citations omitted).

Thus, according to *Phillips,* union employees have no need for the protection provided by the public policy exception because their public policy interests may be vindicated through the grievance process, by which they may challenge the basis for the allegedly wrongful employment action and, if

successful, obtain any bargained-for remedies. This proposition has been followed uniformly by Pennsylvania courts, *e.g., Cairns v. SEPTA,* 114 Pa.Cmwlth. 321, 538 A.2d 659, 660–61 (1998); *Ross v. Montour RR. Co.,* 357 Pa.Super. 376, 516 A.2d 29, 32 (1986), as well as by federal courts interpreting Pennsylvania law, *e.g., Slater v. Susquehanna Cnty.,* 613 F.Supp.2d 653, 669 (M.D.Pa.2009); *Harper v. Am. Red Cross Blood Servs.,* 153 F.Supp.2d 719, 721 (E.D.Pa.2001).

> In this context, union-represented employees who wish to contest a termination or hiring decision as without proper cause must do so through the grievance procedure outlined in their CBAs and may not assert independent causes of action under Pennsylvania law, as the protection provided by the CBA negates any need for allowing an independent state law claim in the interest of public policy. Accordingly, [the plaintiff] had no independent Pennsylvania cause of action for wrongful discharge or retaliation for filing a workers' compensation claim.

*Ciferni*, 529 F. App'x at 203–04.

To the extent Plaintiff implies that *Phillips* does not apply here because the union did not properly protect him, he presents no authority upon which the Court could conclude that a public policy exception allows his claim.  Importantly, such an argument would be undermined by the Third Circuit panel's discussion of the issue in *Raczkowski v. Empire Kosher Poultry*, 185 F. App'x 117 (3d Cir. 2006) (not precedential), where the plaintiff argued that "he should have a cause of action for wrongful discharge under Pennsylvania common law, even though he was covered by a collective bargaining agreement and had statutory remedies, because he received no protection from the agreement." *Id.* at 119. The panel stated that

> [i]t is well established under Pennsylvania law that only at-will employees may bring wrongful discharge claims. *Phillips v. Babcock & Wilcox,* 349 Pa.Super. 351, 503 A.2d 36, 37 (1986). The wrongful discharge cause of action was

judicially created for at-will employees "to provide a remedy for employees with no other recourse against wrongful discharge." *Id.* (citing *Geary v. U.S. Steel Corp.,* 456 Pa. 171, 319 A.2d 174, 179 (1974)). It does not apply to employees with collective bargaining agreements who have both contractual remedies against arbitrary discharge and statutory remedies under federal labor law. *Id.; see* 29 U.S.C. § 185.

Raczkowski asserts that, even though he was technically represented by EMES, he should be deemed to be equivalent to an at-will employee because EMES deprived him of legal recourse by arbitrarily failing to file a grievance. But unlike at-will employees, EMES could have used its discretion to file a grievance against Empire on Raczkowski's behalf, and did, in fact, negotiate with Empire over his discharge. Therefore, we affirm the District Court's grant of summary judgment to Empire on Raczkowski's claim for wrongful discharge under Pennsylvania law.

185 F. App'x at 119.

In *Burns v. Salem Tube, Inc.*, Civ. A. No. 02:08-CV-0289, 2009 WL 2448000 (W.D. Pa. Aug. 7, 2009), the court found that *Raczkowski's* holding "that a state wrongful discharge claim may not be pursued by a party to a CBA . . . where the Union allegedly failed its duty of fair representation" was a blanket prohibition on a union member's wrongful discharge cause of action: "this Court must follow the lead of the Pennsylvania courts and the interpretation of Pennsylvania law undertaken by the U.S. Court of Appeals for the Third Circuit and not extend the common law wrongful termination action to those who enjoy rights under a CBA."  2009 WL 2448000, at *12*; see also Diehl v. U.S. Steel/Edgar Thomson Works*, No. CV 09-948, 2010 WL 11693624, at *8 (W.D. Pa. Jan. 21, 2010) (no wrongful discharge remedy available where plaintiff was unsuccessful with his grievance).

.     The Court agrees that Pennsylvania and Third Circuit cases support the conclusion

that it is the fact of union membership and CBA coverage that precludes a wrongful

discharge claim and a plaintiff's assertion that the union did not properly represent him does

not provide a different result.  In light of *Phillips* and the guidance provided by *Raczkowski*

and district courts within the Third Circuit, the Court concludes that Plaintiff has not come

forward with evidence to rebut Defendant's argument that his wrongful discharge claim is

precluded by his union membership and coverage under a CBA.  Therefore, Defendant's

motion for summary judgment should be granted as to Plaintiff's claim for wrongful

discharge.

## V.  CONCLUSION

For the reasons discussed above, Pocono Mountain Regional Police Commission's

Motion for Summary Judgment (Doc. 34) will be granted in part and denied in part.  The

motion will be granted as to Plaintiff's wrongful discharge claim and denied as to Plaintiff's

age discrimination claim.  An appropriate Order is filed simultaneously with this

Memorandum Opinion.


                                             _s/ Robert D. Mariani_____
                                             Robert D. Mariani
                                             United States District Judge